UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MAINE

In re:

MONTREAL, MAINE & ATLANTIC

RAILWAY, LTD.,

    Debtor.

Bk. No.  13-10670

Adversary Proceeding No. 14-1001

ROBERT J. KEACH, solely in his capacity
as the chapter 11 trustee for MONTREAL,
MAINE & ATLANTIC RAILWAY, LTD.,

    Plaintiff

v.

WORLD FUEL SERVICES
CORPORATION, WORLD FUEL
SERVICES, INC., WESTERN
PETROLEUM COMPANY, WORLD
FUEL SERVICES, CANADA, INC.,
PETROLEUM TRANSPORT
SOLUTIONS, LLC, IRVING OIL
LIMITED, AND CANADIAN PACIFIC
RAILWAY COMPANY

    Defendants.

**CANADIAN PACIFIC RAILWAY
COMPANY'S MEMORANDUM OF
LAW IN SUPPORT OF 28 U.S.C. §
157(D) AND FED. R. BANKR. P.
5011(A) MOTION TO WITHDRAW
THE REFERENCE**

       Robert J. Keach's, the chapter 11 trustee for Montreal, Maine & Atlantic Railway,

Ltd. (MMAR), amended complaint against Canadian Pacific Railway Company (CP) will

not survive Federal Railway Safety Act (FRSA) preemption.  But that determination is

not for bankruptcy court resolution; a district court must make that decision.  Courts

"*shall* [] withdraw a proceeding [from the bankruptcy court] if the court determines that

resolution of the proceeding requires consideration of both title 11 and other laws of the

United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (emphasis added).

The amended complaint unquestionably calls for the consideration of activities — namely, the shipment of hazardous materials across state and international borders — that affect interstate commerce because the FRSA, the Hazardous Materials Transportation Act (HMTA), and numerous regulations promulgated by the Secretary of Transportation regulate such undertakings. Simply put, a comprehensive federal regulatory scheme governs all aspects of crude-oil transportation by rail. 28 U.S.C. § 157(d) therefore requires withdrawal of the reference.

Besides that, the bankruptcy court lacks prerogative to adjudicate. *Stern v. Marshall* and its progeny restrict final judicial authority over negligence and preemption disputes to the district court. --- U.S. --- 131 S. Ct. 2594 (2011). Neither CP's proof of claim nor the amended complaint's opportunistic assertion of a disallowance claim (Count II) vests the bankruptcy court with Article III authority. A contrary conclusion would violate constitutional separation of powers principles and foment judicial inefficiency. The circumstances of this case afford this Court with plenty of cause to exercise discretion and withdraw the bankruptcy reference. 28 U.S.C. § 157 (d).

## BACKGROUND

### A. The amended complaint

On December 16, 2014, the bankruptcy court granted the trustee leave to join CP and Irving Oil while reserving both new defendants' opposition to the trustee's claims. ECF Doc. No. 88. A December 23, 2014 Order gave CP until sometime in April or May,

2015 to respond.  ECF Doc. No. 88.  Resolution of this motion will determine the forum in which CP's motion or answer will be filed and where further proceedings will take place.

## B.    The negligence claim

Two theories supposedly support the trustee's common-law negligence claims. First, CP should have declined to carry the Bakken oil[1] tendered in DOT-111 tank cars that supposedly lack requisite crash robustness.  Despite this safety condemnation, the trustee acknowledges that such rolling stock are the "most common types of tank cars used to transport [] crude oil throughout North America[.]"  *See, e.g.*, Amended Complaint ¶ 9, 42, 46.

Second, the trustee charges that the shipper misclassified the crude oil and that CP should not have moved the oil until the lading was properly classified.  The amended complaint incredibly asserts that an accurate classification would have motivated MMAR to act more prudently and that such extra caution would have prevented the derailment. *See, e.g., id.* ¶ 10, 83.  Specifically, the bill of lading should have classified the oil as "Packing Group I," rather than "Packing Group III."  *Id.* ¶ 69-70.  A Packing Group I classification denotes lower flash and boiling points.  *Id.* ¶ 51-57.

According to the amended complaint, defendants owed duties to MMAR and to the public to take "measures to avoid or mitigate the dangers associated with the transportation of their crude oil cargo."  *Id.* ¶ 110.  The amended complaint does not say

---

[1] U.S. Hazardous Material Regulations formally designate the cargo as "Petroleum Crude Oil," but the more common reference is simply crude oil.

6851054v10

which of the defendants owed which duties. Nonetheless, the trustee apparently accuses all defendants of (1) failing to properly investigate, analyze, and classify the crude oil, (2) failing to challenge the crude-oil classification, (3) allowing the crude oil to be shipped in DOT-111 tank cars, and (4) failing to stop the shipment until the lading was correctly classified. *Id.* ¶ 113.

No specific allegations charge CP with having or breaching classification or packaging duties. But the amended complaint does assert that the "*party offering a hazardous material for shipment* within the United States and/or importation into Canada" must ensure:

> (i) all hazardous materials are properly identified and classified; (ii) the hazard class or classes that characterize the hazard(s) associated with the material are properly identified; (iii) the proper packing group, if applicable, is assigned to each material; and (iv) the hazardous material is transported in appropriate packaging.

*Id.* ¶ 48 (emphasis added).

As the common carrier, CP offered nothing for shipment. The World Fuel defendants shipped the oil, and Irving received the oil. *Id.* ¶ 74. Hence, the World Fuel defendants, Irving Oil, or both "offer[ed] a hazardous material for shipment." *Id.* ¶ 62 & 73.

The amended complaint also references Canadian transportation of dangerous goods regulations obligating consignors to accurately classify lading. *Id.* ¶ 49. The amended complaint asserts that the consignors had a "duty to withhold the crude oil from shipment or transport until the shipment was properly classified." *Id.* ¶ 106. And if Irving suspected a classification error, as consignee and importer, the refiner had a "duty

to not place the goods for shipment, or to stop the shipment, until the classification was corrected." *Id.* ¶ 107. But the amended complaint mentions no duty that CP owed to anyone, and certainly not to MMAR.

The only supposed misfeasance discrete to CP involves another Canadian regulation: "[a] carrier who notices an error in classification or has reasonable grounds to suspect an error in classification while the dangerous goods are in transport must advise the consignor and must stop transporting the dangerous goods until the consignor verifies or corrects the classification." *Id.* ¶ 49. Assuming that a Canadian regulation could create a duty in the U.S. — where this shipment originated, where the federal regulations impose no such duty, and where this case will pend — the amended complaint asserts nothing to suggest that CP either noticed or suspected a classification error.[2]

Instead, the trustee maintains "upon information and belief" that CP had "extensive dealings" with the World Fuel defendants and had "access" to material safety data sheets (MSDSs). *Id.* ¶ 108. But the amended complaint lacks a factual basis for the "extensive dealings" allegation, and mere "access" to MSDSs is a far cry from suspecting a Packing Group classification error.

---

[2] The amended complaint does not state whether U.S. or Canadian law governs. But after CP's opposition to the amendment demonstrated that FRSA and HMTA preemption foreclosed the negligence claim, the trustee's reply brief scrambled to embrace Canadian law as "govern[ing] its claims against CP." ECF Doc. No. 77 at 6. This belated and convenient assertion contradicts the amended complaint's repeated invocation of U.S. regulations.

6851054v10

### C. Proof of claim disallowance count

The amended complaint's second count disclaims MMAR responsibility for any proof of claim "whether based on contract, tort, subrogation, indemnification, contribution, reimbursement, or otherwise" "based on the Defendants' actions or inactions, as described in the preceding paragraphs of this Amended Complaint." *Id.* ¶ 123.

### D. "Core" allegations

The amended complaint labels the negligence causes of action against CP as "a core proceeding as defined in 28 U.S.C. § 157(b)(2), including, without limitation, § 157(b)(2)(C)." *Id.* ¶ 21. Section 157(b)(2)(C) includes "counterclaims by the estate against persons filing claims against the estate." Because CP filed a proof of claim, the trustee deems the negligence count to be core. Based upon that pronouncement the trustee declares the bankruptcy court to be empowered "consistent with the United States Constitution, [to] exercise the judicial power of the United States of America." *Id.* ¶ 21. In fact, regardless of claim characterization, the Constitution incapacitates an Article I court from rendering Article III final judgments.

## ARGUMENT

### I. The withdrawal of reference standard

Congress vested the district courts with the following bankruptcy jurisdiction:

> [N]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). Despite this jurisdictional grant, district courts routinely refer

bankruptcy cases to bankruptcy courts.

To preserve the constitutionality of such references, Congress limits bankruptcy court authority. The district court: (i) must "withdraw" matters requiring the interpretation of non-bankruptcy laws, or (ii) may "withdraw" the reference "for cause shown." 28 U.S.C. § 157(d).

For several reasons the reference of this case should be withdrawn. First, the trustee's claims require substantial consideration of non-bankruptcy laws. Second, the procedural context calls for permissive withdrawal because: (1) CP will demand a jury trial; (2) the amended complaint asserts a *Stern* claim; (3) judicial economy, uniformity, and efficiency would be promoted; and (4) CP has not shopped the forum.

## II. The need to consider non-bankruptcy law warrants mandatory withdrawal

### A. The mandatory withdrawal standard

28 U.S.C. § 157(d) mandates that this Court "shall" withdraw the reference if "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." "This section was part of the congressional response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), which held unconstitutional the broad grant of jurisdiction given to bankruptcy judges under the Code to hear and determine all matters arising under or related to Title 11." *In re Chateaugay Corp.*, 86 B.R. 33, 36 (S.D.N.Y. 1987).

Section 157(d) "reflects Congress' view that the jurisdiction of specialized courts should be limited to areas within the realm of their expertise." *So. Pac. Transp. Co. v.*

*Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 383 (E.D. Tex. 2000) (citing *AT & T v. Chateaugay Corp.*, 88 B.R. 581, 583 (S.D.N.Y. 1988)). The limitation on bankruptcy court authority "assures litigants that under certain circumstances their assertion of a federally created right will be considered by an Article III judge who considers laws regulating interstate commerce on a regular basis." *Id.; see also In re Horizon Air*, 156 B.R. 369, 373 (N.D.N.Y. 1993); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 454 B.R. 307, 312 (S.D.N.Y. 2011) (same); *In re Ames Dept. Stores Inc.*, 512 B.R. 736, 740 (S.D.N.Y. 2014) (same); *In re Am. Freight Sys., Inc.*, 150 B.R. 790, 794 (D. Kan. 1993) ("The purpose of § 157(d) is to take from the bankruptcy courts those matters requiring the application of non-bankruptcy federal statutes affecting interstate commerce and give them to the district courts which have more experience in applying those laws."). Hence, "there is a Congressional presumption in favor of Article III courts conducting such interpretation, especially when the non-code issue is dominant." *United States v. G-I Holdings, Inc.*, 295 B.R. 222, 225 (D.N.J. 2003).

In Re *White Motor Corp.*, first interpreted what "consideration" of laws affecting interstate commerce meant. 42 B.R. 693 (N.D. Ohio 1984). Apprehensive about creating an "escape hatch through which most bankruptcy matters [would] be removed to the district court," the court regarded "consideration" to be something more than mere reference to other federal laws; instead, the laws requiring judicial consideration had to be material to the "resolution" of the issue. *Id.* at 700, 703-04 (quoting colloquy during House debate (130 Cong. Rec. H1849–50 (daily ed. Mar. 21, 1984))). "In other words, where the bankruptcy judge would have to engage in 'something more than the mere

process of examining, thinking about or taking into account' federal laws outside of the Code, § 157(d) mandates withdrawal." *In re Horizon Air*, 156 B.R. at 373.[3]

"Section 157(d) must [] be read to require withdrawal not simply whenever non-Code federal statutes will be *considered* but rather only when such consideration is necessary for the *resolution* of a case or proceeding." *In Re White Motor Corp.*, 42 B.R. at 703 (emphasis in original). What became known as the *White Motor* test provides as follows: "§ 157(d) ... must be read to require withdrawal of the proceedings from the Bankruptcy Court only if th[e] Court can make an affirmative determination that resolution of the claims will require *substantial and material* consideration of those non-Code statutes." *Id.* at 705 (emphasis added).

"Consideration is 'substantial and material' when the case requires the bankruptcy judge to make a 'significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes.'" *Sec. Investor Prot. Corp.*, 454 B.R. at 312 (quoting *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *In re Dana Corp.*, 379 B.R. 449, 453 (S.D.N.Y. 2007)). "The 'substantial and material consideration' element for mandatory withdrawal is satisfied where resolving the action would require the bankruptcy court to 'engage itself in the intricacies' of non-bankruptcy law, as opposed to a 'routine application of a non-Bankruptcy Code federal statute' to the facts of the case." *In re Ames Dept. Stores Inc.*, 512 B.R. at 741 (quoting *Shugrue v. Air Line Pilots Ass'n, Int'l*, 922 F.2d 984, 995 (2d Cir. 1990)) (citing *Cal. v. Enron Corp., (In*

---

[3] Quoting *In re Am. Freight Sys., Inc.*, 150 B.R. at 792 (citing *In re White Motor Corp.*, 42 B.R. at 704).

*re Enron Corp.*, No. 05–cv–4079, 2005 WL 1185804, at *2 (S.D.N.Y. May 18, 2005))
("bare contention[s] about" non-bankruptcy law ramifications do not warrant withdrawal:
what matters is "*the degree* to which the bankruptcy judge would have consider the
federal non-bankruptcy laws") (emphasis in *Ames*)). To withdraw the reference,
however, the Court need not resolve the non-bankruptcy-law issues.

A court is "only required to determine whether such substantial and material
consideration would be entailed in resolving the merits, and 'need not resolve the merits
of [the parties'] positions for purposes of th[e] motion.'" *Id.* (quoting *Bear, Stearns Sec.
Corp. v. Gredd*, No. 01–cv–4379, 2001 WL 840187, at *3 (S.D.N.Y. July 25, 2001)); *see
also Sec. Investor Prot. Corp.,* 454 B.R. at 312 ("in determining whether withdrawal of
the reference is mandatory, this Court need not evaluate the merits of the parties' claims;
rather, it is sufficient for the Court to determine that the proceeding will involve
consideration of federal non-bankruptcy law").

When addressing § 157(d) in the context of federal laws affecting interstate
commerce, courts regularly find that preemption defenses and federal
legislative/regulatory schemes require "substantial and material consideration" of federal
law.

*Securities Investor Protection Corp.,* assessed whether federal preemption called
for a "significant interpretation" of federal law. 454 B.R. 307 (S.D.N.Y. 2011). The
assertion of a common-law claim compelled withdrawal of the reference because to
decide the court had to "interpret a federal statute outside of Title 11 – namely SLUSA
[Securities Litigation Uniform Standards Act]." *Id.* at 312. Similar to the FRSA, the

SLUSA can have state-law claim preemptive effects. *Id.* at 313. "[D]etermining whether the Trustee's action is preempted by SLUSA requires substantial interpretation of federal non-bankruptcy law"; the Constitution assigns that task to Article III courts. *Id.* at 314.

*Southern Pacific Transp. Co. v. Voluntary Purchasing Groups, Inc.* presented a CERCLA settlement, encompassed within a bankruptcy plan, to an Article III court for approval because "the process of approving such agreements requires a court to determine whether the agreements are fair, reasonable, and faithful to CERCLA's objectives, which in turn requires a determination of the various parties' proportionate liability under CERCLA." 252 B.R. 373, 381-82 (E.D. Tex. 2000).

"It is well settled that CERCLA is a statute 'rooted in the commerce clause' and is precisely 'the type of law ... Congress had in mind when it enacted the statutory withdrawal provision [in § 157(d)].'" *Id.* at 382 (quoting *Nat'l Gypsum*, 134 B.R. 188, 191 (N.D. Tex. 1991) (quoting *United States v. ILCO*, 48 B.R. 1016, 1021 (N.D. Ala. 1985))). Therefore mandatory withdrawal turned on whether resolving the issue "requires substantial and material consideration of CERCLA or merely requires that statute's straightforward application to a particular set of facts." *Id.* at 382.

Such "process will require the court to examine the unique facts of the case in light of those CERCLA provisions which create the causes of action at issue." *Id.* at 384. "Because that process requires 'significant interpretation of [a] federal law[ ] that Congress would have intended to [be] decided by a district judge rather than a bankruptcy judge,' the Bankruptcy Court was without jurisdiction to engage in that process[.]" *Id.* (quoting *AT & T*, 88 B.R. at 584 (quoting *Johns–Manville*, 63 B.R. at 602)).

*LightSquared Inc. v. Deere & Co.* withdrew the reference for state-law-tort claims that "alleged 'interference' concerns that could result from [plaintiff's] FCC-authorized spectrum operations." No. 13 Civ. 8157 (RMB), 2014 WL 345270, at *1 (S.D.N.Y. Jan. 31, 2014). The §157(d) motion considered whether the claims were "preempted by federal law or barred by the Noerr-Pennington doctrine." *Id.* at *2. "The Noerr–Pennington doctrine is a 'body of caselaw constituting a limitation upon the scope of the Sherman Act,' and has been applied [like preemption] to 'immunize' parties from antitrust liability for taking concerted actions before courts and administrative agencies." *Id.* at *3. Since deciding the defense would be "far from straightforward" and would "implicate 'the intricacies of non-Bankruptcy law, as opposed to routine application of that law[ ]'" the court withdrew the reference. *Id.* at *4.

*United Systems Access Telecom, Inc. v. Northern New England Telephone Operations, LLC*, involved telecommunications agreement compensation. 456 B.R. 148 (D. Me. 2011). The plaintiff sought § 157(d) mandatory withdrawal of the reference because the Federal Communications Act extensively regulates telecommunications. *Id.* at 149. The court determined the "dispute will require 'consideration' of federal telecommunications law." *Id.* "Withdrawal, therefore, [was] mandatory." *Id.*

*In re Ames Dept. Stores* determined that § 157(d) required withdrawal of the reference because the court would have to engage in "substantial and material consideration of the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015," including the statute's "preemption framework", which was "integral" to the disposition of the proceeding. 512 B.R. at 741-42.

*Boricua Motors Corp. v. Tamachi, Inc.*, held purchase-agreement, specific-performance-claim withdrawal to be mandatory. 76 B.R. 891, 892 (D.P.R. 1987). The contract could not be "interpreted and the case thus resolved without giving due consideration to the issues of the Sherman Act, the Robinson-Patman Act, and the Dealers' Day in Court Act, all non-code statutes regulating interstate commerce." *Id.*

*In re American Freight System, Inc.* mandatorily withdrew the reference because the "adversary action cannot be resolved without giving substantial and material consideration to whether the ICC had the authority under the Interstate Commerce Act to promulgate the recent regulations at issue." 150 B.R. 790, 795 (D. Kan. 1993).

A counterclaim in *Michigan Milk Producers Association v. Hunter*, accused the plaintiff of entering into an agreement in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. 46 B.R. 214 (N.D. Ohio 1985). The plaintiff's denial of those charges required the court to substantially and materially consider the antitrust laws to resolve the claims. *Id.* at 216. That job was for an Article III court.

In *In Re Ilco, Inc.*, the United States charged debtors with violating various federal environmental laws. 48 B.R. 1016 (N.D. Ala. 1985). The district court withdrew the reference because the government's claims called for a detailed examination of complex federal regulations. *Id.* at 1021, 1022.

This case requires mandatory withdrawal because this Court will have to substantially and materially interpret federal laws that pervade and preempt the trustee's negligence claim – namely the FRSA and the HMTA, both of which undeniably "affect[] interstate commerce." Notably, several courts within the Eighth Circuit, including the

Eighth Circuit, misinterpreted FRSA preemptive intent. *See, e.g., Lundeen v. Canadian Pac. Ry. Co.*, 447 F.3d 606, 612-15 (8th Cir. 2006), *overruled by* 532 F.3d 682 (8th Cir. 2008). This judicial confusion led Congress to enact clarifying legislation. 49 U.S.C. § 20106 (2007); H.R. Conf. Rep. No. 110-259, at 351 (2007), *reprinted in* 2007 U.S.C.C.A.N. 119, 183. Hence, an act of Congress was necessary to correct several courts' misreading of this railroad regulatory and state-law preemptive statute. The bankruptcy court is equally likely to struggle with the interpretation and application of the FRSA.

The same complexities would plague resolution of Count II (disallowance of CP's proof of claim, presumably based upon alleged railroad negligence) because according to the trustee "there is complete overlap." ECF Doc. No. 77 at 6.

### B. The FRSA preempts railroad-negligence claims

#### 1. The FRSA

In 1970, Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA authorizes the Secretary of Transportation to "prescribe regulations ... for every area of railroad safety." 49 U.S.C. § 20103(a). The FRSA created the Federal Railroad Administration (FRA), an agency within the Department of Transportation (DOT), to promulgate and to enforce laws, regulations, and orders related to railroad safety and security. 49 U.S.C. § 20106(a)(1). That superintendence "shall be nationally uniform to the extent practicable." *Id.*

-14-

"To maintain this uniformity, the FRSA contains an express preemption clause." *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 890 (8th Cir. 2012). "This preemption clause allows for some coordination between state and federal regulation, providing that '[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation ... prescribes a regulation or issues an order *covering* the subject matter of the State requirement.'" *Id.* (quoting 49 U.S.C. § 20106(a)(2)) (emphasis added).

*CSX Transp., Inc. v. Easterwood*, explained the effect of federal regulatory coverage on the "subject matter of the State requirement." 507 U.S. 658 (1993). When a FRA regulation "substantially subsumes," federal law preempts. *Id.* at 664.

Hence, when the federal government regulates, FRSA preemption forecloses the imposition of state-law duties. 49 U.S.C. § 20106; *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 358–59 (2000), *Easterwood*, 507 U.S. at 664. The statute's preemptive reach does not end with state statutes and regulations because "regulation can be as effectively exerted through an award of damages[.]" *Law v. Gen. Motors Corp.*, No. C 94-3585 SBA, 1995 WL 542496, at *4-5 (N.D. Cal. June 15, 1995) *aff'd*, 114 F.3d 908 (9th Cir. 1997) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246–47 (1959)).

### 2.    The preemption regime

No state or local authority can trump the force of federal law. The FRA wields plenary authority to prescribe "regulations and issue orders for every area of railroad safety." *In re Derailment Cases*, 416 F.3d 787, 793 (8th Cir. 2005) (quotes omitted); 49

U.S.C. § 20103. The FRSA therefore preempts state common-law claims purporting to subject railroads to standards of care different than the federal regulations. *Easterwood*, 507 U.S. at 664, 671-73 ("Legal duties imposed on railroads by the common law fall within the scope of these broad phrases."); *Shanklin*, 529 U.S. at 358.

The FRSA preempts when (1) FRA regulations cover the subject matter of common-law claims, and (2) the railroad complies with the covering regulations. *Grade v. BNSF Ry. Co.* 676 F.3d 680, 687 (8th Cir. 2012). Hence, only failure to comply with a covering FRA regulation can subject a railroad to tort-law accountability. *Shanklin,* 529 U.S. 358; 49 U.S.C. § 20106(b)(1); *Grade*, 676 F.3d at 687.

Congress clarified the FRSA in 2007, but the clarification did not change the statute's preemptive effect. *See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1215-16 (10th Cir. 2008); *Smith v. Burlington N. & Santa Fe Ry. Co.*, 187 P.3d 639, 646 (Mont. 2008) ("Section 1528 of the 9/11 Act did not overrule the FRSA preemption analysis as announced in *Shanklin*"); *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 765 n.14 (7th Cir. 2008); *Grade*, 676 F.3d at 687. In sum, holding CP liable for the Lac Mégantic disaster when the railroad violated no covering regulation would defy congressional intent. *Id.*; *Shanklin*, 529 U.S. at 358; *see also Int'l Longshoremen's Ass'n AFL-CIO v. Davis*, 476 U.S. 380, 388 (1986).

6851054v10

### 3. The FRSA and federal hazardous material transportation regulations

"The Hazardous Materials Transportation Act[4] (49 U.S.C. App. § 1801 et seq.) (HMTA) governs the intermodal regulation of hazardous material transportation; the Secretary of Transportation (Secretary) has authority to promulgate rules and regulations under it." *CSX Transp., Inc. v. Pub. Utils. Comm'n*, 901 F.2d 497, 498 (6th Cir. 1990), *cert. denied*, 498 U.S. 1066 (1991). The HMTA established "a uniform national scheme of regulation regarding the transportation of hazardous materials." *Roth v. Norfalco LLC*, 651 F.3d 367, 370 (3d Cir. 2011); *Consol. Rail Corp. v. City of Dover*, 450 F. Supp. 966, 974 (D. Del. 1978) (the HMTA's purpose "was to provide a means for uniform regulation on the subject"). "The regulatory scheme constructed by the HMTA and HMR controls during the interstate movement of hazardous materials…." *Noffsinger v. Valspar Corp.*, --- F. Supp. 2d ---, 2014 WL 3705176, at *3 (N.D. Ill. July 24, 2014).

Federal preemption prevails regardless of which enabling statute authorizes the regulation. For example, *CSX Transp., Inc. v. Pub. Utils. Comm'n*, considered whether FRSA or HMTA preemption displaced Ohio transportation regulations. 901 F.2d. at 501. "[S]hould a train carrying a load of hazardous waste be considered a railroad which happens to be carrying hazardous waste (thus suggesting application of the FRSA

---

[4] In 1975, Congress enacted the HMTA. Pub. L. No. 93-633, 88 Stat. 2156. In 1990, the Hazardous Materials Transportation Uniform Safety Act ("HMTUSA") amended and recodified the law. 49 U.S.C. §§ 5101-27 (1994). Invoking the authority that Congress vested in the DOT and giving effect to those statutes, the Secretary promulgated Hazardous Materials Regulations (HMR). 49 C.F.R.§§ 170 – 180.

preemption provision) or hazardous waste which happens to be carried by rail (thus suggesting application of the HMTA preemption provision)?" *Id.*

After assessing the HMTA and the FRSA's statutory histories, the court chose the latter:

> FRSA preemption relates to all rules and regulations regarding railroad safety *promulgated by the Secretary*, whether or not such regulations are promulgated by the FRA through power delegated by the Secretary. *See* 45 U.S.C. § 434. Clearly, the HMTA is a law relating to railroad safety, even if regulations pursuant to it are promulgated by the Secretary directly, not by the FRA. …

> We find that the language of the FRSA, "any law ... relating to railroad safety," 45 U.S.C. § 434, applies to the HMTA as it relates to the transportation of hazardous material by rail. The plain meaning of a statute must be given great weight. …

> A failure to follow the preemption provision of the HMTA in no respect ousts the HMTA. In this case, the decision of the district court, applying the FRSA preemption provision to regulations promulgated under the HMTA, retains the essential character and purpose of both statutes. The national character of railroad regulation and the need for regulation of hazardous material transportation on an intermodal basis are both respected.

*Id.* at 501-03 (emphasis in original).

"Stated differently, because FRSA preemption refers to acts 'by the Secretary,' a regulation affecting railroad safety promulgated pursuant to the HMTA takes FRSA's preemptive effect." *Bradford v. Union Pac. R.R. Co.*, 491 F. Supp. 2d 831, 839 (W.D. Ark. 2007) (allegations that carrier "was negligent in the manner in which it stored, handled and transported hazardous materials" preempted by HMTA regulations because "[t]he secretary has enacted 49 C.F.R. §§ 171-80 to deal with the handling, storage and transportation of hazardous materials").

*Easterwood* supports regulatory preemptive effect regardless of statutory source: "[T]he plain terms of Section 434 do not limit the application of its express pre-emption clause to regulations adopted by the Secretary pursuant to FRSA. Instead, they state that any regulation 'adopted' by the Secretary may have pre-emptive effect, *regardless of the enabling legislation.*" 507 U.S. at 663 n.4 (emphasis added); *see also CSX Transp. v. Williams*, 406 F.3d 667, 671 n. 6 (D.C. Cir. 2005) ("FRSA preemption can apply even though [the regulation] was expressly promulgated pursuant to the Hazardous Materials Transportation Act").

### 4. HMTA preemption

In any event, the application of the HMTA, rather than the FRSA, would not change the preemptive outcome. "The HMTA preemption provision was, and is, the linchpin in Congress' efforts to impose nationwide regulatory uniformity." *Roth*, 651 F.3d at 378. Federal law preempts all state laws and regulations regarding "hazardous materials transportation" that are "not substantively the same" as federal regulations. 49 U.S.C. § 5125(b).

"[T]here is nothing in the HMTA to indicate that Congress did not wish to preempt state common law requirements." *Roth*, 651 F.3d at 378-79. 49 C.F.R. §§ 171-180 comprehensively cover the "handling, storage and transportation of hazardous materials." *Bradford*, 491 F. Supp. 2d at 839; *Roth*, 651 F.3d at 371.

*Roth* arose from a DOT-111 tank car explosion. *Id.* at 370, 371-72. "Chemical tank cars, which serve as bulk containers for hazardous materials, are subject to their own unique set of detailed specifications." *Id.* at 377. 49 C.F.R. § 179, subpart D specifies

the applicable tank car design and construction requirements.[5]  *Id*.  49 U.S.C. § 5125(b) preempts an "attempt[] to impose a design requirement on a chemical tank car" that goes "beyond those imposed by the [regulations]."  *Id.* at 376-77.

The common-law imposition of "tank car design requirements" would create "a 'patch-work' of multiple and potentially conflicting jurisdictional mandates, with resulting confusion over how to comply," frustrating congressional intent to create "a uniform, national scheme of regulation regarding the transportation of hazardous materials."  *Id.* at 377.  "In sum, the structure and purpose of the HMTA confirms what the text of § 5125(b)(1) makes plain: the HMTA preempts state common law claims that, if successful, would impose design requirements upon a package or container qualified for use in transporting hazardous materials in commerce."  *Id.* at 379.

### 5.    Preemption of the lading misclassification claim

The trustee's attempt to make CP responsible for Packing Group designations must yield to the comprehensive federal regulatory scheme.  The regulations charge entities other than the common carrier with classifying lading.

The Packing Group regulations obligate a shipper in the U.S., where the oil train originated, to test and to determine hazardous lading risks.  "[49 C.F.R.] Section 173.22 is entitled 'Shipper's responsibility' and states that a shipper 'shall class and describe the hazardous material in accordance with parts 172 and 173 of this subchapter, and ... shall determine that the packaging or container is an authorized packaging, including part 173

---

[5] Citing 49 C.F.R. §§ 179.200-3, 4, 6, 14, 19, 21, 22.

requirements, and that it has been manufactured, assembled, and marked in accordance with the relevant regulations." *Noffsinger*, 2014 WL 3715009, at *4 n.4.

A common carrier has no duty to scrutinized packaged cargo. *Crockett v. Uniroyal, Inc.*, 592 F. Supp. 821, 824 (M.D. Ga. 1984) *aff'd*, 772 F.2d 1524 (11th Cir. 1985) (carrier's duty limited to defects that external observations would reveal, and "[i]t is not the duty of the [] carrier to enter a loaded, closed car to inspect the cargo"); *Casella v. Norfolk & W. Ry. Co.*, 381 F.2d 473, 479 (4th Cir. 1967) (railroad has no "legal duty to inspect the lading").

According to the amended complaint, the "party offering a hazardous material for shipment" breached the following duties:

> (i) all hazardous materials are properly identified and classified; (ii) the hazard class or classes that characterize the hazard(s) associated with the material are properly identified; (iii) the proper packing group, if applicable, is assigned to each material; and (iv) the hazardous material is transported in appropriate packaging.

¶ 48.   These supposedly unfulfilled tasks are synonymous with the obligations of "a person [who] offer[s] a hazardous material for transportation[.]"  49 C.F.R. § 173.22 – "Shipper's responsibility."

The amended complaint asserts that the "World Fuel Defendants and Irving," not CP, "offer[ed] a hazardous material for shipment."  Amended Complaint, ¶ 62 & ¶ 73. On the face of the pleading, the Packing-Group-negligence claim against CP fails.  If that were not enough, the trustee's attempt to foist state-law, lading-classification duties on

CP contravenes the governing federal regulatory scheme.[6]  The regulations make the shipper/consignor and the receiver/consignee exclusively responsible for Packing Group classification accuracy.

Besides holding the consignor and consignee accountable, HMR regulations specify that a "carrier who transports a hazardous material in commerce may *rely* on information provided by the offeror of the hazardous material or a prior carrier, unless the carrier knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the offeror or prior carrier is incorrect."  49 C.F.R. § 171.2(f) (2014) (emphasis added).  Hence, CP could and did reasonably rely on "the World Fuel Defendants and Irving" to correctly classify Packing-Groups.  Nothing alleged in the amended complaint suggests that CP knew or had reason to know that the World Fuels defendants erroneously classified the crude oil.

### 6.    Preemption of DOT-111 tank car claim

Federal law preempts the trustee's charge that CP should have declined to accept the DOT-111 cars.  The comprehensive regulatory scheme authorizes the shipment of crude oil in DOT-111 cars.  CP had no choice about accepting the cargo as packaged.

The Interstate Commerce Commission Termination Act of 1995 (ICCTA) eliminated the Interstate Commerce Commission (ICC) and transferred virtually all rail-

---

[6] The 2007 FRSA clarification has no effect.  49 U.S.C. § 20106(b) does not preempt "State law causes of action" alleging that a carrier "failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation."  But only a shipper, and not a common carrier, could violate 49 C.F.R. § 173.22 by misclassifying the Packing Group.

commerce-regulatory functions to the newly created Surface Transportation Board (STB). The transferred functions included enforcement of the long-ago established "common carrier obligation." In 1906, the Interstate Commerce Act first legislated that duty, and the enabling language remains essentially unchanged: "A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part *shall* provide the transportation or service on reasonable request." 49 U.S.C. § 11101(a) (emphasis added).

> a. Federal law obligated CP to transport DOT-approved tank cars

The common-carrier obligation creates two interrelated duties. Railroads must furnish requesting persons written common-carrier rates. 49 U.S.C. § 11101(b). And upon reasonable request, the services specified by those rates must be provided. 49 U.S.C. § 11101(a). The obligation extends to "transport[ing] hazardous materials where the appropriate agencies have promulgated comprehensive safety regulations." *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 342 (D.C. Cir. 2013) (quoting *Eric Strohmeyer*, No. 35527, 2011 WL 5006471, at *1 (Surface Transp. Bd. Oct. 18, 2011)); *see also Akron, Canton & Youngstown R.R. Co. v. I. C. C.*, 611 F.2d 1162, 1169 (6th Cir. 1979).

The *Riffin* carrier tried to avoid hazardous materials carriage obligations. But the "Department of Transportation, Federal Railroad Administration, Transportation Security Administration, and Nuclear Regulatory Commission" had promulgated "extensive regulations governing the transportation of hazardous materials by rail." 733 F.3d at 342. The carrier's refusal to haul would create transportation service "gaps" by enabling

-23-

railroads to "define the scope of their own common carrier obligations." *Id.* at 347. "[A]llowing a railroad to avoid its obligation to transport hazardous materials [] would require it improperly to substitute its judgment about safety for that of the regulatory agencies." *Id.* at 346.

As recently as December 2, 2014, the Sierra Club and others sued the United States over the DOT's failure to ban crude-oil shipments in supposedly unsafe DOT-111 tank cars. Declaration of Paul J. Hemming, Ex. A (ECF Doc. No. 70-1). The Secretary refused to issue an emergency order banning DOT-111 tank cars and instead insisted that an ongoing study of tank car safety and availability continue. *Id.* At least until the regulators completed that assessment, DOT-111 cars would remain on the rails. *Id.* So far, the Secretary lacks sufficient safety information to embargo the shipment of crude oil in DOT-111 tank-cars. Accordingly, before the DOT was even asked to act, CP was certainly in no position to refuse the World Fuels defendants' tender of DOT-111 tank cars.

> b.    HMTA regulations authorize the carriage of crude oil in
>       DOT-111 tank cars

The federal regulatory scheme preempts claims that would require crude oil to be shipped in something other than DOT-111 tank cars. The denial of transportation service to such cars would violate CP's common carrier obligation.

In fact, the Lac Mégantic derailment spawned a regulatory debate over DOT-111-tank-car safety. "The Pipeline and Hazardous Materials Safety Administration (PHMSA or we), in coordination with the Federal Railroad Administration (FRA), is proposing:

new operational requirements for certain trains transporting a large volume of Class 3 flammable liquids; improvements in tank car standards; and revision of the general requirements for offerors to ensure proper classification and characterization of mined gases and liquids." 79 Fed. Reg. 45016 (Aug. 1, 2014). While the proposed regulations call for the phasing out of DOT-111 tank cars, the extant regulations approve transportation of crude oil in those tankers: "The DOT Specification 111 tank car is one of several cars authorized by the HMR for the rail transportation of many hazardous materials, including ethanol, crude oil and other flammable liquids." *Id.* at 45025.

49 C.F.R. § 172.101 specifies that for "Petroleum crude oil," Packing Group I, the provisions of 49 C.F.R. § 173.243 govern. And for "Petroleum crude oil," Packing Groups II and III, the provisions of 49 C.F.R. § 173.242 govern. *Id.* 49 C.F.R. § 173.242(a) approves the hauling of Class 3 crude oil, Packaging Group III (low hazard liquid) and Packaging Group II (medium hazard liquid) in DOT-111 tank cars. Similarly, and fatal to the trustee's negligence claim, 49 C.F.R. § 173.243(a) sanctions the carriage of Class 3 crude oil, Packing Group I (high hazard liquid) in DOT-111 tank cars.

The trustee insists that the "so called DOT-111's" are "unsafe and unsuitable for the transport of [crude oil]" (Amended Complaint, ¶ 9) and maintains that "prudent and safe shipping practices" (*Id*. ¶ 46) require supposedly safer tank cars. The amended complaint repeatedly condemns DOT-111-tank-car crash worthiness. But such attacks defy the federal-regulatory scheme specifying DOT-111 tank-car-design standards and

blessing crude-oil transportation in such packaging. 49 C.F.R. §§ 172.101; 173.242(a); 173.243(a); Part 179, Subpart D (2014).[7]

### C. Consideration of the FRSA and the HMTA mandate withdrawal

Established law presumes that an Article III court will decide federal preemption when that issue "dominat[es]" over bankruptcy issues. *G-I Holdings*, 295 B.R. at 225. Section 157(d) guarantees parties, like CP, facing claims, like the trustee's, Article III adjudication. *So. Pac. Transp. Co*, 252 B.R. at 383. A "specialized [bankruptcy] court[]" should not delve into an area of law that does not regularly affect insolvency proceedings. *Id.* at 382. "Withdrawal is mandatory if substantial consideration of nonbankruptcy federal statutes is required[.]" *In re Jackson Brook Inst., Inc.*, 280 B.R. 779, 782 (D. Me. 2002).

Interpretation and application of the FRSA, the HMTA, and the myriad regulations giving effect to those statutes, as well as preemptive ramifications of those laws profoundly affect interstate commerce. No rail car, especially one laden with hazardous materials, moves in this country without awareness of and compliance with the covering federal regulations. Disputes implicating those laws must therefore be decided by an Article III court. To rule on the trustee's causes of action a bankruptcy court would have to do "more than the mere process of examining, thinking about or taking into

---

[7] The FRSA's preemption "clarification" exempted "an action under State law" based upon regulatory violations from FRSA preemption. 49 U.S.C. § 20106(b). But the trustee has not accused CP of "fail[ing] to comply with the federal standard of care established by a regulation or order issued by the Secretary of Transportation." *Id.* In fact the contrary is true. The trustee purports to inculpate CP for obeying the regulation by accepting DOT approved DOT-111 cars.

account federal laws outside of the Code." *In re Horizon Air*, 156 B.R. at 373.

The FRSA and HMTA provide equal if not more "extensive regulation" affecting interstate commerce than the Federal Communications Act. *United Sys. Access Telecom.* 456 B.R. at 149. And like in *Securities Investor Protection Corp.*, a FRSA preemption assessment "requires substantial interpretation of federal non-bankruptcy law." 454 B.R. at 314. "Resolution" of this action will most certainly require a ruling on CP's preemption defense. *In Re White Motor Corp.*, 42 B.R. at 703. The Constitution has reserved that role for an Article III court.

## III. Permissive withdrawal would also be appropriate

A district court may withdraw the reference under 28 U.S.C. § 157(d) "for cause shown." "Although neither § 157 nor the First Circuit defines what constitutes 'cause,' courts in this District balance a variety of factors, including 'judicial economy; whether withdrawal would promote uniformity of bankruptcy administration; reduction of forum shopping and confusion; conservation of debtor and creditor resources; expedition of the bankruptcy process; and whether a jury trial has been requested.'" *Turner v. Boyle*, 425 B.R. 20, 24 (D. Me. 2010). "The moving party bears the burden of demonstrating cause." *Id.* The statute places the permissive withdrawal decision within the sound discretion of the district court. *In re H&W Motor Express Co.*, 343 B.R. 208, 214 (N.D. Iowa 2006).

### A. Judicial economy and uniformity, and trial by jury

"In determining judicial economy, courts weigh the preponderance of 'core' versus 'noncore' claims." *In re Jackson Brook Inst., Inc.*, 280 B.R. 779, 782 (D. Me. 2002). "The analysis of judicial economy and uniformity of bankruptcy administration

depends largely on whether the claims are core or noncore." *Turner*, 425 B.R. at 24; *see also Growe ex rel. Great N. Paper, Inc. v. Bilodard Inc.*, 325 B.R. 490, 492 (D. Me. 2005) (same).

"In noncore bankruptcy matters, efficiency and uniformity favor the proceedings occurring in district court: because the bankruptcy court may only issue proposed findings of fact and conclusions of law subject to *de novo* review by the district court, there is a high potential for duplication of effort." *Turner*, 425 B.R. at 24. "Such concerns increase when a valid jury demand is made and the parties do not consent to trial in bankruptcy court." *Id.* "In addition, withdrawal to district court will not disrupt the uniform administration of bankruptcy law because noncore claims only indirectly relate to it." *Id.*

"Because of the heightened scrutiny required of the District Court in reviewing noncore matters, the argument for withdrawal in such cases is stronger." *Growe*, 325 B.R. at 492-93. "In many such cases, a proceeding in District Court will enable the parties to obtain a final judgment more expeditiously and efficiently than a proceeding in Bankruptcy Court followed by a *de novo* review by the District Court." *Id.* at 493. "In addition, the nature of noncore claims, which generally relate only indirectly to bankruptcy law, alleviates concerns that withdrawal will disrupt the uniform administration of bankruptcy law." *Id.*

A valid jury demand without an accompanying consent to a trial before bankruptcy court "can have the effect of mandating withdrawal to the District Court for trial." *Id.* at 492. "Due to the fact that a District Court Judge must eventually preside

over the jury trial in this matter, it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation." *In re Transcon Lines*, 121 B.R. 837, 838 (C.D. Cal. 1990); *see also In re Star Creditors' Liquidating Trust*, No. 03-793-KAJ, 2004 WL 406353, at *1 (D. Del. Mar. 3, 2004) ("Because it is essentially conceded that Defendants are entitled to a jury trial, it appears more efficient for [the district court] to manage the case through the pretrial process."); *Pelullo v. Kerr, Russel & Weber*, Nos. 95-22430, 96-2254, 96-MC-303, 1997 WL 535155, at *2 (E.D. Pa. Aug. 15, 1997) (withdrawing the reference because the district court would have to "conduct a jury trial without the benefit of having overseen pre-trial matters"). *Cf. Travelers Indem. Co. v. The Babcock & Wilcox Co*, No. Civ. A. 01-3387, 2002 WL 100625, at *4 (E.D. La. Jan. 23, 2002) ("Generally, the inability of a bankruptcy court to hold a jury trial in a related matter is a ground for a district court to withdraw the reference from a bankruptcy court.").

**B.** **Stern supports CP's judicial economy, trial by jury, and uniformity arguments**

The Supreme Court recently platted the bounds of Article I court constitutional authority. That delineation displaced the former core/non-core construct for assessing efficiency and uniformity: *Stern v. Marshall*, --- U.S. ---, 131 S. Ct. 2594 (2011), & *Exec. Benefits Ins. Agency v. Arkison* (*In re Bellingham*), --- U.S. ---, 134 S. Ct. 2165 (2014). A proceeding may be "core" for Bankruptcy Code purposes but, nonetheless, constitutionally exceed bankruptcy court resolution authority. *See Stern*, 131 S. Ct. at 2609-11. An issue that is either "non-core," as defined by the Bankruptcy Code, or

statutorily designated as "core," but constitutionally beyond bankruptcy judicial power – *i.e.* a so called "*Stern* claim," *In re Bellingham* 134 S. Ct. at 2170 – can only be preliminarily considered in bankruptcy proceedings.

Bankruptcy courts cannot finally decide claims seeking to "augment the bankruptcy estate" or implicating "private rights." *Stern*, 131 S. Ct. at 2615-16. Article III of the Constitution only vest Article III courts with that authority. *Id.*

28 U.S.C. § 157(b)(2)(C), which designates "counterclaims by the estate against persons filing claims against the estate" as "core" proceedings for bankruptcy judges to "hear and determine," impermissibly delegates the "judicial power of the United States" to non-Article III judges. *Id.* at 2600-01. A judge imbued with Article III prerogative and privilege must resolve "a suit [ ] made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 2609 (quotation omitted).

While Congress can confer "public rights jurisdiction" on legislative courts, those Article I tribunals cannot entertain claims that have traditionally been raised in Article III fora. *Id.* at 2609-10. "Some claims labeled by Congress as 'core' may not be adjudicated by a bankruptcy court in the manner designated by §157(b)." *In re Bellingham*, 134 S. Ct. at 2172. The amended complaint's characterization of the Adversary Proceeding as "core" (¶ 21) does not overcome the bankruptcy court's constitutional incapacity to resolve private common-law-negligence claims.

The Constitution confines "public rights" claims "only to matters arising between individuals and the Government in connection with the performance of the constitutional functions of the executive or legislative departments . . . that historically could have been

determined exclusively by those branches." *Stern*, 131 S. Ct. at 2609-10 (quotation omitted). For example, a bankruptcy trustee's fraudulent-conveyance counterclaim overstepped the "public rights" exception: "fraudulent conveyance suits [are] 'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.'" *Id.* at 2614 (citing G*ranfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-56 (1989)). Accordingly, such claims are "'more accurately characterized as a private rather than a public right[.]'" *Id.* at 2614 (quoting *Granfinanciera*, 492 U.S. at 55).

When claim resolution goes beyond "public rights" "[t]he Constitution assigns that job – resolution of the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of facts as well as issues of law – to the Judiciary." *Id.* at 2609 (quotation omitted). Private rights are "the liability of one individual to another under the law as defined." *Id.* at 2612. "[S]tate common law [disputes] between two private parties" implicate private rights, regardless of Bankruptcy Code labels. *Id.* at 2614.

In the wake of *Stern*, 28 U.S.C. § 157(a) has been read to allow bankruptcy courts to decide certain creditor claims, but so-called "private right" adjudications—regardless of whether the proceeding is labeled core or non-core—remain within the exclusive purview of Article III courts. *Kirschner v. Agoglia*, 476 B.R. 75, 78, 80 (S.D.N.Y. 2012) (citing *Stern*, 131 S. Ct. at 2611-16). That constitutional mandate means that the private rights asserted by the trustee must be vetted before an Article III judge.

Even when a creditor seeks recourse against the bankruptcy estate, a proof of claim filing does not empower the bankruptcy court to adjudicate *Stern* claims. *Stern*, 131 S. Ct. at 2616. Bankruptcy courts lack prerogative over controversies unless the disputes "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618. By charging CP with negligence, the trustee unquestionably seeks to augment the estate. The reasonableness of CP's conduct or the railroad compliance with the federal regulations does not affect the allocation of MMAR's estate among the many creditors.

*Stern* left open the question of how so-called *Stern* claims should be resolved. *In re Bellingham* provided the answer: if a *Stern* claim "satisfies the criteria of § 157(c)(1),"—that is, if the cause of action is "related to a case under title 11"—then "the bankruptcy court simply treats the claims as non-core." *Id.* at 2173. Thus if a district court refers a *Stern* claim, the most a bankruptcy court can do is "issue proposed findings of fact and conclusions of law." *Id.* at 2170. The district court then "review[s] the claim *de novo* and enter[s] judgment." *Id.*

Before *Stern* and *In re Bellingham*, courts regarded the statutory "core/non-core" distinction as determinative of whether to withdraw the reference: the district court reviewed "core" claim dispositions under a deferential appellate review standard; whereas the district court scrutinized "non-core" claim resolutions *de novo*. Circumstances requiring *de novo* review strongly favored withdrawal of a bankruptcy reference because "unnecessary costs could be avoided by a single proceeding in the

district court." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993).[8]  After

*Stern* and *In re Bellingham*, the core/non-core distinction no longer bears on *de novo*

review appropriateness.  But in deciding whether to withdraw the reference, the *de novo*

review logic remains the same—the most important factor should be whether the

bankruptcy court's disposition will be reviewed *de novo*.  If the bankruptcy court can do

no more than issue proposed findings and conclusions then withdrawal avoids the

"unnecessary costs" associated with duplicative claim consideration.

Like in *Stern*, the trustee labels the negligence cause of action against CP as "a

core proceeding under §157(b)(2)(C)" – "counterclaims by the estate against persons

filing claims against the estate."  Amended Complaint,  ¶ 21.  But the trustee cannot

pretend that misclassifying crude oil or shipping in supposedly uncrashworthy tank cars

implicates "public rights."  Those negligence causes of action have nothing to do with the

ordering or reordering of creditor bankruptcy claims.  *Stern*, 131 S. Ct. at 2614 ("public

rights" claims influence the "'creditors' hierarchically ordered claims to a pro rata share

of the bankruptcy res.'") (quoting *Granfinanciera*, 492 U.S. at 56).   By claiming

entitlement to negligence damages, which are said to "vastly exceed" CP's proof of

claim, the trustee seeks to augment, not to simply administer, the bankruptcy estate.  *Id.;*

Amended Complaint, ¶ 123.

---

[8] "When *de novo* review is compelled, no form of appellate deference is acceptable." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *accord Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) ("*de novo* review is 'review without deference'").  *De novo*, "review is independent and plenary; as the Latin term suggests, [the court will] look at the matter anew, as though it had come to the courts for the first time." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168 (2d Cir. 2001).

Accordingly, a negligence claim against CP presents a "private right"—that is, "the liability of one individual to another under the law as defined." *Stern* 131 S. Ct. at 2612 (internal quotation marks and citation omitted). Under the common law, state negligence principles would determine CP's liability—if not preempted by federal law. CP's submission of proof of claim does not enable an otherwise powerless Article I court to decide a *Stern* claim.

No issues bearing on crude oil classification and packaging propriety would "necessarily be resolved in the claims allowance process." *Id.* at 2618. Whether CP owed a duty, the scope of any such a duty, the breach of that duty, and the federal regulatory substantial subsumption of that duty go well beyond proof-of-claim concerns.

The dispositive issue – the preemption of the trustee's negligence claim—poses a question of law. Any bankruptcy court legal determination would be subject to a *de novo* Article III review.

The need for Article III decision-making cannot be gainsaid. In order to "avoid the waste of judicial resources that would result if [the district court] were forced to conduct *de novo* review of the Bankruptcy Court's findings," judicial economy calls for the issues to be assessed once, and only once. *In re Almac's Inc.*, 202 B.R. 648, 659 (D.R.I. 1996). Withdrawal of the reference would also avoid inevitable motion practice over the scope of the bankruptcy court's authority – a consideration that supports withdrawal, so as to "obviate any issues that may arise" regarding Article I authority. *See, e.g.*, *In re Adelphia Commc'ns Corp. Secs. & Deriv. Litig.*, No. 03 MDL 1529, 2006 WL 337667, at *5 (S.D.N.Y. Feb. 10, 2006).

## C. Other factors warrant withdrawal of the reference

"Inasmuch as the bankruptcy court's determinations on non-core matters are subject to *de novo* review by the district court, unnecessary costs could be avoided by a single proceeding in the district court." *Sec. Farms v. Int'l Brd. of Teamsters*, 124 F.3d 999, 1009 (9th Cir. 1997). Accordingly, the "conservation of debtor and creditor resources" justifies withdrawal of the reference. This factor, similar to judicial efficiency, focuses on the avoidance of time and cost expenditures that can be accomplished by proceeding once, in the first instance, before the district court. *In re NDEP Corp.*, 203 B.R. 905, 913 (D. Del. 1996) (without withdrawing the reference "Court would have been required to review the findings of fact and conclusions of law of the bankruptcy judge in light of the controlling law, so there would have been significant duplication of effort"); *In re Pelullo*, 1997 WL 535155, at *2 ("permitting this action to proceed in the bankruptcy court, even for pretrial matters, would require duplication of the bankruptcy court's efforts . . . this court would have to review the bankruptcy court's orders *de novo*"). The "expedition of the bankruptcy process" also weighs in favor of withdrawing the reference.

Finally, by this motion, CP does not forum shop. MMAR chose this forum because U.S. operations are headquartered in Maine. CP merely requests that the court with the requisite constitutional authority preside from the outset.

## CONCLUSION

To rule on the trustee's claims the Court will have to assess the FRSA, the HMTA and the many regulations spawned by those Acts. Both statutes affect interstate

commerce. In fact, the subject matter of those statutes is the regulation of interstate commerce. Deciding preemption would require the bankruptcy court to do more than merely think about or take into account controlling and comprehensive federal laws.

Resolution of this action requires substantial interpretation and application of the federal preemption regime, which assesses the trustee's claims against the backdrop of the many federal regulations covering the subject matter of those allegations. For that reason, this Court should withdraw the reference, and this adversary proceeding should be transferred to the United States District Court for the District of Maine.

Dated:  January 15, 2015

**BRIGGS AND MORGAN, P.A**

By: *s/ Timothy R. Thornton*
    Timothy R. Thornton
    John R. McDonald
    Paul J. Hemming
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 977-8400


**And**

**PEARCE & DOW, LLC**

By:*/s Joshua R. Dow*
    Joshua R. Dow
Two Monument Square, Suite 901
PO Box 108
Portland, Maine 04112-0108
(207) 822-9900 (Tel)
(207) 822-9901 (Fax)

**ATTORNEYS FOR CANADIAN
PACIFIC RAILWAY COMPANY**

6851054v10