## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MONTREAL MAINE & ATLANTIC | ) | |
| RAILWAY, LTD., | ) | |
| | ) | Bk. No. 13-10670 |
| Debtor. | ) | Chapter 11 |

---

| | | |
|---|---|---|
| ROBERT KEACH, solely in his | ) | |
| capacity as the chapter 11 trustee for | ) | |
| MONTREAL MAINE & ATLANTIC | ) | |
| RAILWAY, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 14-1001 |
| | ) | Docket No. 1:15-mc-22-NT |
| WORLD FUEL SERVICES CORP., | ) | |
| WORLD FUEL SERVICES, INC., | ) | |
| WESTERN PETROLEUM CO., | ) | |
| WORLD FUEL SERVICES, CANADA, | ) | |
| INC., PETROLEUM TRANSPORT | ) | |
| SOLUTIONS, LLC, CANADIAN | ) | |
| PACIFIC RAILWAY CO., and IRVING | ) | |
| OIL LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANT CANADIAN PACIFIC'S MOTION TO WITHDRAW THE REFERENCE

Before me is Defendant Canadian Pacific Railway Co.'s ("**Canadian Pacific**") motion requesting that I withdraw the reference of an adversary proceeding that was automatically referred to the Bankruptcy Court. For the reasons stated below, I **DENY** the motion.

## FACTUAL & PROCEDURAL BACKGROUND[1]

On June 29, 2013, a train known as "**Train 282**" departed from an intermodal transloading facility in New Town, North Dakota with seventy-two tank cars in tow, bound for an Irving Oil Ltd. ("**Irving**") refinery in Saint John, New Brunswick. Under an arrangement Irving had with World Fuel Services Corp. and a number of affiliated entities (collectively, the "**World Fuel Affiliates**"), the cars had been loaded with crude oil transported to New Town by truck.

Canadian Pacific operated Train 282 from New Town to Cote Saint-Luc, Québec. There, it transferred control of the train to Montreal Maine & Atlantic Railway, Ltd. ("**MMA**"), which was to carry it the remainder of its journey.

At about 11:25 p.m. on July 5, 2013, MMA stopped Train 282 for the evening in Nantes, Québec. Shortly after midnight, the Nantes Fire Department was called to put out a fire in one of Train 282's locomotives. The train's lead engine was powered down to allow firefighters to put down the blaze, and the fire was extinguished by 12:15 a.m. on July 6, 2013. Firefighters turned the train over to the custody of an MMA employee, who allegedly left the scene without restarting the lead engine.

Without power from a running locomotive, Train 282's air-brake system lost power and the train began rolling downhill toward Lac-Mégantic. It reached downtown at around 1:15 a.m. and derailed, causing many of its tank cars to rupture.

---

[1]    The underlying facts, gleaned from the Trustee's Amended Complaint, the World Fuel Affiliates' proofs of claim, Canadian Pacific's proof of claim, and the parties' briefing, are not materially disputed for the purposes of the motion before the Court.

Large explosions and a massive, uncontrolled fire followed. Forty-seven people were killed.

Lawsuits against MMA mounted in the weeks following the accident, including wrongful death claims filed in Cook County, Illinois (later transferred to this District) and a proposed class action filed in the Superior Court of the Province of Québec. Facing massive potential liability, MMA petitioned for chapter 11 bankruptcy in this District on August 7, 2013. MMA's Canadian subsidiary initiated a parallel bankruptcy case in the Superior Court of the Province of Québec. On August 21, 2013, Robert Keach was appointed as the trustee of the bankruptcy estate in the U.S. case (the "**Trustee**").

To date, MMA's purported creditors have filed nearly 500 proofs of claim[2] in the U.S. case seeking approximately $2.1 billion from the bankruptcy estate. Among those are proofs of claim filed by each of the World Fuel Affiliates and by Canadian Pacific. The World Fuel Affiliates' proofs of claim dispute that they bear any fault for the Lac-Mégantic tragedy and assert claims for subrogation, indemnification, reimbursement, and contribution related to the wrongful death suits. *In re Montreal & Atlantic*, Bk. No. 13-10670, D. Me. Bankr. Ct., Claim Register, Doc. Nos. 28-1 through 32-1. Canadian Pacific's proof of claim also disputes that it bears any fault

---

[2]      The Bankruptcy Code statutorily defines the term "claim" broadly, to refer to any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, . . . disputed, undisputed, legal, [or] equitable, secured, or unsecured," or any "right to an equitable remedy for breach of performance" that could give rise to a right to payment. 11 U.S.C. § 101(5); *see also Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 35-36 (1st Cir. 2009) (explaining that Congress "gave the term 'claim' the 'broadest available definition.' " (quoting *F.C.C. v. NextWave Pers. Commc'ns*, 537 U.S. 293, 302 (2003)).

for the derailment and asserts the following: (1) claims for subrogation, indemnification, contribution, and reimbursement for any amount Canadian Pacific is required to pay under the wrongful death suits and the Québec class action; and (2) claims for reimbursement for any amount Canadian Pacific is ordered to pay under (a) a lawsuit for the value of Train 282's cargo and railcars, among other things, brought by a number of the other defendants in this adversary proceeding, (b) other lawsuits for derailment-related property damages that may be brought against Canadian Pacific in the future, and (c) environmental remediation orders issued by the Québec Minister of Sustainable Development, Environment, Wildlife and Parks. Am. Claim #92, *In re Montreal & Atlantic*, Bk. No. 13-10670, D. Me. Bankr. Ct., Claim Register, Doc. No. 92-2, ¶¶ 6-30 ("**Can. Pac.'s Am. Proof of Claim**").

In response, the Trustee initiated an adversary proceeding, filing a complaint both: (1) objecting to the allowance of the claims filed by the World Fuel Affiliates and Canadian Pacific; and (2) asserting common law negligence claims against Canadian Pacific, three of the World Fuel Affiliates, and Irving. *Keach v. World Fuel Services Corp. (In re Montreal, Me. & Atlantic Ry., Ltd.)*, Bk. No. 13-10670, Adversary Proceeding No. 14-1001, Doc. No. 95, First Am. Compl., ("**Tr.'s Am. Compl.**").

The complaint implicates the Defendants under two main theories of liability. First, it alleges that the Defendants had duties to evaluate whether the train's load was classified properly and that they breached those duties by classifying it as low volatility "Packing Group III" cargo rather than high volatility "Packing Group I" cargo. Tr.'s Am. Compl. ¶¶ 7-8, 111. Had they properly classified the crude oil, the

4

complaint alleges, MMA would have operated Train 282 under more stringent protocols that would have prevented the derailment altogether. Tr.'s Am. Compl. ¶ 83. Second, it alleges that the Defendants had a duty to ensure that the cargo was packaged safely, and that they breached that duty by shipping the crude oil in unsuitable non-retrofitted DOT-111 tank cars. Tr.'s Am. Compl. ¶¶ 9, 111. Had they shipped the crude oil in stronger tank cars, the complaint alleges, the derailment would not have caused nearly as much damage. Tr.'s Am. Compl. ¶¶ 9-11, 114.

The complaint also narrows in on a more specific legal theory of why Canadian Pacific should bear liability for the Lac-Mégantic disaster despite its limited role in the events preceding it. It asserts that Canadian Pacific "had reasonable grounds to suspect that the classification of the crude oil shipment was incorrect" and therefore "had an affirmative duty to not carry the shipment or to stop the shipment until the classification was correct." Tr.'s Am. Compl. ¶ 108. The Trustee clarified at oral argument that this is the only claim he intends to bring against Canadian Pacific.[3]

The Trustee's complaint was automatically referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and Local Rule 83.6. In lieu of filing an answer, Canadian Pacific filed the motion before me, requesting the withdrawal of the reference pursuant to 28 U.S.C. § 157(d). *See* Can. Pac.'s Mem. of Law in Support of Mot. to Withdraw Reference (ECF No. 1-1) ("**Can. Pac.'s Mot.**").

---

[3]      Because most of the complaint's allegations are directed at "the Defendants" collectively, it can be fairly read to assert more expansive claims against Canadian Pacific. The Trustee asserts he did not intend to raise such broad claims against Canadian Pacific and I construe the complaint in light of his narrowing clarification.

## DISCUSSION

Article I of the United States Constitution authorizes Congress to pass "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8, cl. 4. Under this grant of authority, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "**1984 Act**" or the "**Act**"), Pub. L. 98-353, 98 Stat. 333, which vests United States district courts with "original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the "**Bankruptcy Code**" or the "**Code**"], or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

The Act also provides that "[e]ach district court may provide that . . . all cases under title 11 and . . . all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The District of Maine has established a standing rule, Local Rule 83.6, which does just that.

Another 1984 Act provision, 28 U.S.C. § 157(d), permits and in some cases requires district courts to withdraw the reference of a proceeding from a bankruptcy judge. It provides as follows:

> The district court *may* withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court *shall*, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphasis added).

6

As the above passage shows, Section 157(d) contains two prongs: (1) a federal law prong;[4] and (2) a cause prong.[5] *See id.* Canadian Pacific seeks to have this Court withdraw the reference of the adversary proceeding under both prongs and the Court separately addresses each.

## I.      Federal Law Prong

Canadian Pacific argues that the standard for withdrawal under the federal law prong is met here because the Trustee's claim against it will require consideration of federal railroad law, including the Federal Railroad Safety Act's ("**FRSA**") preemption scheme and Department of Transportation regulations. The Trustee counters that Canadian Pacific has failed to show why federal railroad law is implicated at all and, even if it is, why the deciding judge would have to engage in "substantial and material consideration" of that law to resolve this case, as required under the applicable standard interpreting Section 157(d)'s federal law prong. *In re White Motor Corp.*, 42 B.R. 693, 705 (N.D. Ohio 1984); *see also Howard v. Can. Nat'l Ry. Co.*, No. 04-MC-0056-B-S, 2005 WL 758446, at *1 (D. Me. Feb. 23, 2005) (adopting the *White Motor* test).

---

[4]      This prong is intended to "assure[ ] litigants that under certain circumstances their assertion of a federally created right will be considered by an Article III judge who considers laws regulating interstate commerce on a regular basis." *S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 382 (E.D. Tex. 2000).

[5]      Although courts typically refer to the federal law prong as the "mandatory" prong and the cause prong as the "discretionary" prong, those terms can be confusing. As discussed in greater detail below, the Seventh Amendment and constraints on bankruptcy judges' authority to conduct jury trials may in certain circumstances *require* withdrawal of the reference under the cause prong, notwithstanding its employment of the word "may." *See Growe ex rel. Great N. Paper, Inc. v. Bilodard Inc.*, 325 B.R. 490, 492 (D. Me. 2005).

I address Canadian Pacific's argument for withdrawal of the reference under Section 157(d)'s federal law prong in light of both of the Trustee's counter-arguments.[6]

### A.   Whether Canadian Pacific Has Shown that Consideration of Non-Code Federal Law is Required

As a threshold matter, the federal law prong requires withdrawal of the reference only if this Court can make an "affirmative determination" that resolution of the claims hinges on non-Code federal law. *White Motor*, 42 B.R. at 705. The Trustee and Canadian Pacific dispute whether the Trustee's claims will involve the consideration of federal law. Canadian Pacific takes the position that the adversary proceeding will be governed by the FRSA, which will preempt any common law standards of care. *See* Can. Pac.'s Mot. 7-27. Canadian Pacific contends that under the FRSA, shippers/consignors and receivers/consignees bear exclusive responsibility for the classification of dangerous substances, and a mere carrier like itself has no duty in that regard. *See* Can. Pac.'s Mot. 21-22. The Trustee argues that Canadian substantive law will decide his claims, not U.S. federal railroad law, noting that his complaint concerns Canadians killed and injured in a derailment on Canadian soil. Tr.'s Opp'n to Can. Pac.'s Mot. 7-9 (ECF No. 17) ("**Tr.'s Opp'n**").

---

[6]     The Trustee also raises a third argument meriting less attention—that Canadian Pacific's motion is untimely, because it waited until seven months after it filed its proof of claim to move to withdraw the reference. This argument leaves out two crucial facts: (1) that the Trustee did not object to Canadian Pacific's proof of claim until January 15, 2015; and (2) that Canadian Pacific filed its motion to withdraw the reference the very same day. Because a proof of claim is prima facie evidence of a claim's validity, *see* Fed. R. Bankr. P. 3001(f); 11 U.S.C. § 502(a); *Whitney v. Dresser*, 200 U.S. 532, 535 (1906), Canadian Pacific would have had no reason to anticipate that "substantial and material consideration" of *any* law would be required to allow or disallow its claim until the Trustee registered his objection.

Neither party briefed the choice-of-law principles that would govern this question.[7] Perhaps Canadian Pacific failed to undertake a meaningful analysis of Maine's choice of law factors because it takes the position that even if Canadian law were to apply, the relevant Canadian regulations merely refer back to U.S. federal railroad regulations found in Title 49 of the United States Code of Federal Regulations.

At the center of the parties' dispute over whether U.S. or Canadian law governs are three Canadian regulations. *See* Canadian Transportation of Dangerous Goods Regulations ("**Canadian TDGRs**") §§ 2.2(6), 10.1(1), 10.1(2)(a) (Canadian Transportation of Dangerous Goods Act of 1992), SOR/2001-286 (Can.). The first of these regulations, which I will refer to as the "**Carrier Classification Duty**," is found in Part 2 of the Canadian TDGRs, which governs classifications of dangerous goods.  This regulation provides:

> A carrier who . . . has reasonable grounds to suspect an error in classification while dangerous goods are in transport must advise the consignor and must stop transporting the dangerous goods until the consignor verifies or corrects the classification. . . .

---

[7]    My own research indicates that federal district courts apply the choice-of-law principles of the forum. *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941); *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). In Maine, courts hearing tort suits apply the law of the forum with the "most significant contacts and relationships" to the issue, considering (a) "the place where the injury occurred," (b) "the place where the conduct causing the injury occurred," (c) "the domicile, residence, nationality, place of the parties," and (d) "the place where the relationship, if any, between the parties is centered." *Flaherty v. Allstate Insurance Co.*, 822 A.2d 1159, 1165 (Me. 2003) (quoting Restatement (Second) of Conflict of Laws § 145 (1971)). In completing this analysis, Maine courts must also "consider" the "principles in section 6 of the Restatement," *id.* at 1167, which include "the needs of the interstate and international systems," "the relevant policies of the forum," "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," and "the basic policies underlying the particular field of law." Restatement (Second) of Conflict of Laws § 6 (1971).

9

Canadian TDGRs § 2.2(6)

The second regulation, which I will refer to as the "**Adoption of U.S. Regulations Provision**," is found in a section entitled "Transporting Dangerous Goods from the United States into or through Canada." Canadian TDGRs § 10.1. It provides, in pertinent part, that:

> Despite the requirements in Part 2, Classification, Part 3, Documentation, and Part 4, Dangerous Goods Safety Marks, a person may handle or transport dangerous goods by railway vehicle from a place in the United States to a place in Canada . . . in accordance with the classification, marking, labelling, placarding and documentation requirements of 49 CFR if [several additional requirements, including some found in Part 3, are met].

Canadian TDGRs § 10.1(1).

The third regulation, which I will call the "**Forbidden Goods Exception**," immediately follows the Adoption of U.S. Regulations Provision.  It provides that the Adoption of U.S. Regulations Provision "does not apply to dangerous goods that . . . are forbidden for transport by [the Canadian TDGRs]." Canadian TDGRs § 10.1(2)(a).

Citing the Adoption of U.S. Regulations Provision, Canadian Pacific argues that even if Canadian law applies, it merely refers back to U.S. federal railroad regulations. The Trustee acknowledges the Adoption of U.S. Regulations Provision, but argues that the Forbidden Goods Exception applies. He claims that the misclassified crude oil at issue was "forbidden for transport" because the Carrier Classification Duty required Canadian Pacific to stop the shipment, as it had reasonable grounds to suspect the shipment was misclassified.

10

Canadian Pacific's reply does not address the Trustee's argument except to assert in conclusory fashion that it "make[s] no sense." Can. Pac.'s Reply to Tr.'s Opp'n 4 (ECF No. 19) ("**Can. Pac.'s Reply**").  But from my vantage point, without the benefit of any briefing on how Canadian courts interpret these regulations, the Trustee's argument is not self-evidently implausible. Canadian Pacific has neither crafted a cogent argument nor provided a single case or authority explaining why its interpretation of the highly technical, comprehensive Canadian regulatory scheme is correct.[8] Because Canadian Pacific has neither briefed the underlying choice of law issue nor explained how the Court should engage in the complex task of interpreting the Canadian TDGRs, I am not in a position to affirmatively determine that U.S. federal law will decide this case. Accordingly, withdrawal of the reference under Section 157(d)'s federal law prong is not warranted.

**B.     Whether Canadian Pacific Has Shown that Substantial and Material Consideration of Non-Code Federal Law Would Be Required if U.S. Federal Railroad Law Governs**

In an abundance of caution, I also analyze whether withdrawal would be required under the test laid out in *White Motor* if I assume federal railroad law governs, as Canadian Pacific urges.

Courts read the language of Section 157(d)'s federal law prong narrowly, to require to withdrawal of the reference only if the Court can make an "affirmative

---

[8]     In addition to failing to provide any authority to support its interpretation, Canadian Pacific quotes italicized sections of the Canadian TDGRs as though this material was part of the regulations. Can. Pac.'s Reply 4. The Canadian TDGRs' own section governing "interpretation" provides that "[a]nything written in italics in these Regulations is not part of the Regulations." Canadian TDGRs § 1.3.

determination" that resolving the claims will require "*substantial and material consideration*" of non-Code federal law. *White Motor*, 42 B.R. at 705 (emphasis added).[9] The substantial and material consideration inquiry is satisfied when resolving the proceeding would require a court to make a "significant interpretation" or "engage itself in the intricacies" of non-Code federal law. *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *Shugrue v. Air Line Pilots Ass'n, Int'l*, 922 F.2d 984, 995 (2d Cir. 1990). The substantial and material consideration inquiry is not satisfied where resolving the case would require only "simple" or "routine" application of non-Code federal law. *City of New York*, 932 F.2d at 1026; *Shugrue*, 922 F.2d at 995. "The legal questions involved need not be of cosmic proportions, but must involve more than mere application of existing law to new facts." *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996) (internal citations and quotation marks omitted); *see also In re Enron Corp.*, No. 05 Civ. 4079 (GBD), 2005 WL 1185804, at *2 (S.D.N.Y. May 18, 2005) (explaining that the proper analysis focuses on "the *degree* to which the bankruptcy judge would have to consider . . . federal non-bankruptcy laws" (internal citations, quotation marks, and bracketing omitted)). Typically, the movant's "burden . . . is more easily met" where resolution of the proceeding will include "matters of first impression." *In re Ames Dep't Stores*, 512 B.R. 736, 741 (S.D.N.Y. 2014) (internal quotation marks and citations omitted).

---

[9]     As the *White Motor* court explained, this narrow, non-literal interpretation is compelled by the relevant legislative history and statutory structure, which indicates that Section 157(d) was never "intended to become an escape hatch through which most bankruptcy matters will be removed to the district court." *White Motor*, 42 B.R. at 705 (internal quotation marks and citations omitted). Both parties agree that the "substantial and material consideration" test first announced in *White Motor* applies. *See* Can. Pac.'s Mot. 8-9; Tr.'s Opp'n 9-10.

The holdings of two federal law prong cases discussed in the parties' briefing provide useful signposts for applying the *White Motor* test. In the first, *Security Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, 454 B.R. 307 (S.D.N.Y. 2011), the standard for withdrawal was met where the movant demonstrated that the question of whether the suit against it was completely preempted depended on a novel and open question of statutory interpretation. *Id.* at 313-14. At issue was whether a bankruptcy trustee bringing a suit asserting the rights of Madoff's defrauded customers should be counted as a single "person" (i.e. a single bankruptcy estate) or as many "persons" (i.e. many defrauded customers) for purposes of determining whether the trustee's suit was a "covered class action" and preempted under the Securities Litigation Uniform Standards Act. *Id.* at 313-14. By contrast, in *American Body Armor & Equipment v. Clark*, 155 B.R. 588 (M.D. Fla. 1993), the standard for withdrawal was not met where the movant merely demonstrated that provisions of the Securities Exchange Act and certain SEC regulations would be determinative, not that the deciding court would have to resolve any legal "complexities or conflicts" to apply them. *Id.* at 590. At issue was whether majority shareholders in a corporation failed to comply with U.S.C. § 78n(c) and 17 C.F.R. § 240.14c-2, which require certain companies to distribute information statements to unsolicited security holders before taking corporate action. *Id.* at 589.

Canadian Pacific argues that the FRSA's express preemption clause displaces any state law governing the Trustee's adversary proceeding. *See* 49 U.S.C. § 20106; *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000). The text of that express

preemption clause has three main functional parts: (1) a baseline preemption rule; (2) a local hazard exception; and (3) a clarification.[10] *See* 49 U.S.C. § 20106(a)-(b). The baseline preemption rule provides that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety," but only "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2); *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (interpreting the phrase "law, regulation, or order" to encompass common law duties). The local hazard exception provides that, notwithstanding the baseline preemption rule, states may nonetheless impose an "additional or more stringent" standard covering the same subject matter as a Department of Transportation ("**DOT**") rule or order where doing so: "(A) is necessary to eliminate or reduce an essentially local safety . . . hazard; (B) is not incompatible with [federal law]; and (C) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(a)(2). Finally, the clarification provides that

> Nothing in [the FRSA's preemption clause] shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party . . . has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . .

49 U.S.C. § 20106(b)(1)(A). Congress added this clarifying language to the statute in 2007, in response to *Lundeen v. Canadian Pacific Railway Co.*, a case where the Eighth Circuit erroneously held that the FRSA preempted all state negligence claims,

---

[10]    The clause also has a purpose statement, which provides that "[l]aws, regulations, and orders related to railroad safety and . . . railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1).

14

even negligence per se claims invoking only a federal standard of care. 447 F.3d 606, 612-15 (8th Cir. 2006), *overruled after Congressional clarification by* 532 F.3d 682 (8th Cir. 2008); *see also* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, § 1528, 121 Stat. 266, 453; H.R. Rep. No. 110-259, at 351 (2007) (Conf. Rep.).

Taken as a whole, the FRSA's preemption clause, as clarified by Congress, establishes a straightforward legal framework. To determine whether a state law, regulation, or order concerning railroad safety is preempted, a court must first determine whether DOT has issued a valid regulation or order related to railroad safety covering the subject matter at issue. If so, the state standard is preempted, unless the local hazard exception applies. If not, the state standard is not preempted.

According to Canadian Pacific's motion, DOT regulations cover the subject matter at issue in this case and Canadian Pacific did not violate those regulations. More specifically, the motion argues that valid DOT regulations place the duty of ensuring that crude oil is properly classified on shippers, not common carriers like Canadian Pacific, *see* 49 C.F.R. § 173.22, and Canadian Pacific therefore had no duty to stop Train 282 even if its cargo was misclassified. *See Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1534 (11th Cir. 1985).

Canadian Pacific has presented a simple, coherent argument that the FRSA would require a court hearing this proceeding to dismiss the claims against it. What Canadian Pacific has failed to demonstrate is why that court would have to engage in anything beyond routine application of current law to do so.

15

Though Canadian Pacific tries to kick up some dust to make the relevant analysis seem complicated, it clears quickly on closer inspection. First, Canadian Pacific points out that courts disagreed about how to apply the FRSA preemption scheme in the past. Can. Pac.'s Mot. 13-14. But as its own briefing reveals, that judicial confusion was cleared up in 2007, when Congress added clarifying language to the statute. Second, Canadian Pacific notes that the regulations at issue were actually promulgated under the authority of the Hazardous Materials Transportation Act ("**HMTA**"), 49 U.S.C. App. § 1801 et seq., not the FRSA. Can. Pac.'s Mot. 17-19. But Canadian Pacific's own briefing also shows that the FRSA preemption scheme applies in precisely the same way to DOT railroad regulations promulgated under the HMTA as it does to DOT railroad regulations promulgated under the FRSA. Third, Canadian Pacific asserted at oral argument that no court has analyzed how the FRSA preemption scheme applies to classification obligations. This attempt to conjure an "issue of first impression" simply because a lawsuit involving these precise circumstances has never been litigated suggests no more than that the deciding judge will have to apply existing law to new facts. Fourth, Canadian Pacific points to the complexity of the parties' disagreement about which body of law provides the relevant standard of care. *See* Can. Pac.'s Reply 3. But as discussed above, it appears that any choice of law issues will be determined, in the first instance, by application of Maine choice of law principles, and then possibly by interpretation of certain Canadian regulations. The complexity here comes in the form of Canadian rather than U.S. federal law.

16

Essentially, Canadian Pacific's briefing identifies its possible route to victory, but no counter-arguments, complexities, or true matters of first impression. On the current record, this proceeding more closely resembles *American Body Armor*, where the moving party merely showed that resolving the claim required application of federal statutes and regulations to new facts, than *Bernard L. Madoff Investment Securities*, where the moving party identified both a genuinely novel legal issue and persuasive arguments on either side of it. Even assuming that the court adjudicating this adversary proceeding would have to apply federal railroad law to resolve the Trustee's claims, Canadian Pacific has failed to demonstrate that doing so would require substantial and material consideration of that law.

## II.   Cause Prong

A party moving for withdrawal under Section 157(d)'s cause prong bears the burden of establishing that withdrawal is warranted. *Turner v. Boyle*, 425 B.R. 20, 24 (D. Me. 2010). The statute does not define the term "cause," but courts deciding the issue typically consider four goals: (1) "promoting uniformity in bankruptcy administration"; (2) "reducing forum shopping and confusion"; (3) "fostering the economical use of the debtors' and creditors' resources"; and (4) "expediting the bankruptcy process."[11] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999

---

[11]     Courts sometimes characterize the "cause" inquiry as a six-factor balancing test that requires considering not only the four goals identified above, but also "judicial economy" and "whether a jury trial has been requested." *See, e.g., In re Larry's Apartment,* 210 B.R. 469, 474 (D. Ariz. 1997). "Judicial economy" is a general umbrella term *Holland America* uses to describe the four more specific goals identified above, *see Holland Am.,* 777 F.2d at 999, and "whether a jury trial has been requested" is relevant because it may eventually compel withdrawal of the reference and therefore alters how the *Holland America* goals operate on a specific set of facts. *See infra* note 13.

(5th Cir. 1985); *see also In re Jackson Brook*, 280 B.R. 779, 782 (D. Me. 2002)
(parenthetically quoting the assertion in *Ponce Marine Farm, Inc. v. Browner*, 172
B.R. 722, 725 n.3 (D.P.R. 1994) that "most courts facing the issue have adopted the . . .
factors articulated by the Fifth Circuit in *Holland America*").

The consideration of these goals is affected by two limits on bankruptcy judges'
powers. First, if the Bankruptcy Court lacks the authority to enter a final judgment
and would only be able to issue proposed findings of fact and conclusions of law for
the district court to review de novo, *see* U.S. Const. art. III, § 1, 28 U.S.C. § 157(c)(1),
*Stern v. Marshall*, 131 S. Ct. 2594 (2011), *Exec. Benefits Ins. Agency v. Arkison (In re
Bellingham)*, 134 S. Ct. 2165 (2015),[12] withdrawing the reference obviates the need
for an extra step of judicial review. *See Turner*, 425 B.R. at 24. Even where this
concern is implicated, district courts sometimes determine that it would be useful to
have the bankruptcy judge's report and recommended decision or that other factors
override any inefficiencies. *See In re Connie's Trading Corp.*, No. 12-11280, 2014 WL
1813751, at *9 (S.D.N.Y. May 8, 2014). Second, if one of the parties has a right to and
demands a jury trial before an Article III judge, *see* U.S. Const. amend. VII, 28 U.S.C.

---

[12]     Under the 1984 Act, bankruptcy judges may only finally resolve "core proceedings arising
under title 11, or arising in a case under title 11." 28 U.S.C. §§ 157(b)(1). Though bankruptcy judges
may "hear" proceedings that are just "*related* to a case under title 11—so-called "non-core"
proceedings—they may not enter final judgment in such proceedings without the parties' consent. 28
U.S.C. § 157(c)(1)-(2). Absent such consent, bankruptcy judges may only issue proposed findings of fact
and conclusions of law subject to de novo review by the district court. 28 U.S.C. § 157(c); Fed. R. Bankr.
P. 9033(a), (d). Though the 1984 Act classifies "counterclaims by the estate against persons filing
claims against the estate" as "core" proceedings, the Supreme Court has held that constitutionally
compelled constraints on the authority of bankruptcy judges require courts to treat such counterclaims
as if they were "non-core" proceedings if they do not implicate "public rights," do not stem from the
bankruptcy itself, and are not necessarily resolved during the claims allowance process. *Stern*, 131 S.
Ct. at 2618-20; *In re Bellingham*, 134 S. Ct. at 2173; *Wellness Int'l Network, Ltd. v. Sharif*, No. 13-193,
575 U.S. ----, slip op. at 7-18 (May 26, 2015).

§ 157(e),[13] withdrawing the reference allows the same judge to preside over both pretrial matters and the trial itself. *See In re Star Creditors' Liquidating Trust*, No. 03-793-KAJ, 2004 WL 406353, at *1 (D. Del. Mar. 3, 2004). Even where this concern is implicated, district courts sometimes determine that it would be more efficient to have the bankruptcy judge manage the proceedings until the case is ready for trial, a procedure that presents no Seventh Amendment problems. *Turner*, 425 B.R. at 23 ("[A] district court might . . . decide that 'a case is unlikely to reach trial, that it will require protracted discovery and court oversight before trial, or that the jury demand is without merit, and therefore conclude that the case at that time is best left in the bankruptcy court.'" (quoting *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101-02 (2d Cir. 1993)).

The proceeding at issue is just a small piece in a sprawling, ten-figure bankruptcy case with many, many moving parts.[14] The Bankruptcy Court has been

---

[13]    The Seventh Amendment provides that "the right of trial by jury shall be preserved" "in suits at common law" where the matter in controversy exceeds twenty dollars. U.S. Const. amend. VII. In turn, 28 U.S.C. § 157(e) provides that "[i]f the right to a jury trial applies in a proceeding," the bankruptcy judge may conduct the jury trial" only if the district court "specially designate[s]" and all parties give their "express consent." By implication, where the right to a jury trial applies but a party withholds consent, the district court must withdraw the reference when the proceeding is trial-ready, *see* 28 U.S.C. § 157(e), presumably via Section 157(d)'s cause prong. S*ee supra* note 5. In general, the right to a jury trial applies to tort actions, including negligence claims, but not to causes of action "customarily heard by courts of equity," such as the Bankruptcy Court. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989). Additionally, it is possible for a party that would otherwise hold a right to a jury trial to lose that right by filing a proof of claim in a bankruptcy case. *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990) (per curiam); *Katchen v. Landy*, 382 U.S. 323, 336-37 (1966).

[14]    During oral argument, the Trustee updated the Court on the progress of the U.S. bankruptcy case and parallel Canadian bankruptcy proceedings. The Trustee indicated that MMA's American and Canadian railway operations have been liquidated and that he and his Canadian counterpart have negotiated a global settlement agreement that will provide over $300 million to victims of the Lac-Mégantic disaster and extinguish any claims arising out of the derailment against the settling defendants. According to the Trustee, the only material parties who have not agreed to settle are Canadian Pacific and the World Fuel Affiliates.

ably presiding over the bankruptcy case for more than a year and a half and is familiar with the divergent interests at stake. Denying the motion for immediate withdrawal of the reference would discourage parties from forum shopping and encourage them to expend their legal energy on the merits of their claims. It would also allow the Bankruptcy Court to oversee the early stages of this adversary proceeding in concert with the rest of the bankruptcy case and allow both this Court and the parties to take advantage of the Bankruptcy Court's broad expertise in bankruptcy law and complex case management. As a general matter, the *Holland America* goals all weigh heavily against finding cause to withdraw the reference under these circumstances.

Canadian Pacific argues that a different result is warranted because the Trustee's negligence claim falls under the holding of *Stern v. Marshall* and because Canadian Pacific is entitled to and plans to demand a jury trial under the Seventh Amendment and 28 U.S.C. 157(e). However, I need not decide whether Canadian Pacific is correct about the application of Article III and the Seventh Amendment, because even if Canadian Pacific is correct, the *Holland America* goals still counsel against withdrawing the reference at this time. To the extent there are *Stern* issues,

---

The Trustee's Canadian counterpart has filed a plan of arrangement in the parallel Canadian proceedings that will be voted on by creditors on June 9, 2015. If it wins enough creditor support, it will come before the Bankruptcy Court's Canadian counterpart for approval on June 17, 2015. Meanwhile, in this District, the Trustee will submit a disclosure statement to the Bankruptcy Court for approval on June 23, 2015. If the disclosure statement is approved, it will be distributed to creditors and a confirmation hearing regarding a proposed plan of liquidation will be held in the Bankruptcy Court on August 20, 2015. According to the Trustee, the Bankruptcy Court will likely hold proceedings to estimate the value of Canadian Pacific's claims against the estate for voting purposes at some point in the next two months. The Trustee anticipates that at some point between June 23, 2015 and August 20, 2015, his Canadian counterpart will submit a filing to the Bankruptcy Court requesting that it recognize the anticipated order approving the Canadian plan of arrangement.

under these circumstances, I find it would be beneficial to have an initial report and recommended decision by the bankruptcy judge. With respect to possible Seventh Amendment issues, it is far from clear that this proceeding will actually reach trial, and even if it does, it will likely require extensive court oversight before trial. Here, the Bankruptcy Court is best situated to provide that oversight.

In sum, Canadian Pacific has not established cause to withdraw the reference of the proceeding at this time.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Canadian Pacific's motion to withdraw the reference.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 8th day of June, 2015.